STATE, *ex rel.* ALMA G. REYNOLDS, *et vir,* v. CITY OF ST. PETERSBURG, *et al.*

183 So. 304.
Opinion Filed August 1, 1938.
Rehearing Denied September 30, 1938.

*J. Carl Lambdin,* for Plaintiffs in Error;

*Carroll R. Runyon, Lewis T. Wray* and *Harry I. Young,* for Defendants in Error.

BUFORD, J.—Writ of error brings for review judgment quashing alternative writ of mandamus.

The command of the alternative writ was:

"Now, THEREFORE, we being willing that full and speedy justice be done in the premises, do command you, the City of St. Petersburg, a municipal corporation, and you, J. W. Wahlman, as Building Inspector of the said City of St. Petersburg, Florida, and each of you, forthwith to issue to the said Alma G. Reynolds and Ira A. Reynolds a permit to erect said buildings in accordance with said plans and specifications upon the filing with you, J. W. Wahlman, as Building Inspector, at your office in the City Hall of the City of St. Petersburg, Florida, of two copies of the plans

and specifications as hereto attached and payment of the sum of Three and 90/100 ($3.90) Dollars, together with the application as refused by you, or that in default thereof, you appear before this court on or before ten days from the date of service of this amended alternative writ at its Chambers in St. Petersburg, Florida, then and there to show cause, if any there be, why you refuse to do so."

The alternative writ alleges:

"(1) That the said J. W. Wahlman is the duly appointed and qualified building inspector of the City of St. Petersburg, and that a part of the duties of said building inspector is to issue permits for the construction of buildings and structures in the corporate limits of the City of St. Petersburg when it is made to appear to the said J. W. Wahlman as building inspector that the provisions of Ordinance 800-A, being the Building Code of the City of St. Petersburg, Florida, have been complied with. That before the construction or alteration of any building or structure, or any part of either, is commenced, and before a permit to do so will issue, the owner or his agent is required to comply with the provisions of the Building Code pertaining to permits, a copy of which Code, being Ordinance 800-A, of the City of St. Petersburg, Florida, is hereto attached and marked 'Exhibit A,' and reference thereto being made as often as may be necessary, and with specific provisions are as follows:

" 'APPLICATION FOR PERMITS.

" '(a) *For Construction or Alterations.* Before the construction or alteration of any building, wall or structure, or any part of either, or of any platform, staging or flooring to be used for standing or seating purposes and before the construction or alteration of the plumbing, drainage or electric work, of any building structure or premises is

commenced, the owner or lessee, or agent of either, or the architect employed by such owner or lessee in connection with the proposed construction, or alteration, shall submit to the Building Inspector two copies of plans and specifications, and such plans, structural details and stress diagrams of the proposed work as the Building Inspector may require. Plans shall be drawn to scale upon substantial paper or cloth and the essential parts shall be drawn to a scale of not less than one eight (1/8) inch to a foot. Plans and specifications shall be of sufficient clarity to indicate the nature and character of the work proposed and to show that the law will be complied with. Computations, strain sheets and stress diagrams and other data necessary to show the correctness of the plans shall accompany the plans and specifications when required by the Building Inspector.

" 'Section 19, PERMITS.

" '(a) *Approval of Applications.* It shall be unlawful to construct or alter any building, structure, wall, platform, staging or flooring, or any part thereof, or any electrical work, plumbing and drainage, until the application and plans required by this Code shall have been approved by the Building Inspector and a written permit issued by him. The Building Inspector shall approve or reject any application, or plan, or amendment thereto, filed with him pursuant to the provisions of this Code within a reasonable time and, if approved, shall promptly issue a permit therefor.

" '(b) *Approval in Part.* Nothing in this Code shall be construed to prevent the Building Inspector from approving and issuing a permit for the construction of part of the building or structure, when plans and detailed statements have been presented for same, before the entire plans and

specifications of said building or structure have been submitted or approved.

"'(c) *Signature to Permit.* Every permit issued by the Building Inspector under the provisions of this Article shall have his signature affixed thereto, but this shall not prevent the Building Inspector from authorizing any subordinate to affix such signature.

"'In all cases the cost of the Plumbing and Electrical work shall be included in the cubic feet or estimated cost of the Building Permit.

"'(h) *Fees.* Any person desiring a permit shall, in addition to filing an application therefor, pay to the City of St. Petersburg before such permit is issued, a fee as required in this section as follows:

"'For each permit One Dollar ($1.00) plus ten cents ($.10) per One Hundred Dollars ($100.00) of the estimated cost of construction, provided, however, that the maximum cost of permit under this paragraph shall not exceed $50.00.'

"That pursuant to the provisions of the said Building Code, Exhibit 'A' hereto, the relators made application to the said J. W. Wahlman as building inspector at his office in the City Hall of the City of St. Petersburg, Florida, tendering to him with said application, copy of which is hereto attached and marked Exhibit 'B,' two copies of the plans and specifications of a proposed dwelling, copy of which plans and specifications is hereto attached and marked Exhibit 'C,' which plans and specifications fully and completely comply with the requirements of said Ordinance 800-A, as will appear from said Ordinance and the Copy of said plans and specifications hereto attached, and together with said plans and specifications, the relators did tender to the said J. W. Wahlman as building inspector the sum of Three and 90/100 ($3.90) Dollars, the lawful fee to be paid prior

to the issuance of said permit as required by said Building Code and shown to be due by said specifications. That upon the making of said application and the filing with the said J. W. Wahlman as building inspector of two copies of said plans and specifications, and the payment of the fee aforesaid, it became the duty of said building inspector to approve said plans and issue a permit if the same complied with the requirements of the Building Code of the City of St. Petersburg.

"(a) That relators, Alma G. Reynolds and Ira A. Reynolds, are the owners of a vacant lot located on 20th Street South in the corporate limits of the City of St. Petersburg in a residential area of said City, said lot being more particularly described as follows: Lot Twelve (12), Block 'H,' Tangerine Park Subdivision of the City of St. Petersburg, Florida, as same appears in map or plat thereof on file and of record in the Public Records of Pinellas County, Florida.

"That on the 26th day of August, 1937, relators entered into a written contract with Harry W. Rise, as contractor, to construct for relators a five-room bungalow and one-car garage on said lot at a contract price of Twenty-eight Hundred Fifty ($2,850.00) Dollars, said bungalow and garage to be constructed according to certain plans and specifications, which plans and specifications were in strict conformity and compliance with the Building Code of the City of St. Petersburg pertaining to structures of that class, and on the 28th day of August, 1937, relators filed their written application for a building permit with the said J. W. Wahlman, Building Inspector of the City of St. Petersburg, as aforesaid, for the issuance of a permit for the construction of said five-room bungalow and one-car garage at the contract price of Twenty-eight Hundred Fifty ($2,850.00) Dollars, to be constructed on the vacant lot above described. With

said application relators tendered to the said J. W. Wahlman two copies of the plans and specifications of said house and garage, which plans and specifications were in strict conformity and compliance with the Building Code of the City of St. Petersburg pertaining to structures of that class. That upon the said presentation of the application and plans and specifications as aforesaid, and the tender of the sum of Three and 90/100 ($3.90) Dollars which the said relators did tender to the said J. W. Wahlman, Building Inspector, it became and was the duty of the said J. W. Wahlman to approve said plans and specifications and issue the permit as requested in said application.

"(3) That the said J. W. Wahlman refused to accept said application and said plans and specifications, and refused to issue to relators a permit to proceed with the work and construction of said buildings on relator's property, basing his refusal upon an allegation that the said application for said permit did not comply with a City Ordinance of the City of St. Petersburg, to-wit, Ordinance 873-A, passed on the 8th day of June, 1937, entitled: 'AN ORDINANCE DEFINING, REGULATING AND GOVERNING GENERAL CONTRACTORS WITHIN THE CITY OF ST. PETERSBURG, FLORIDA: REQUIRING EXAMINATION OF ALL SUCH CONTRACTORS: PRESCRIBING THE TIME WHEN SUCH EXAMINATIONS SHALL BE CONDUCTED; SPECIFYING AND FIXING THE FEE FOR EXAMINATION: SPECIFYING AND FIXING THE AMOUNT OF THE OCCUPATIONAL LICENSE FEES FOR SUCH CONTRACTORS: CREATING A BOARD OF EXAMINERS FOR CONTRACTORS: DEFINING THE DUTIES AND POWERS OF THE BOARD: SPECIFYING AND PROVIDING PENALTIES FOR THE VIOLATION OF THIS ORDINANCE: REPEALING ALL ORDINANCES AND PARTS OF ORDINANCES IN CONFLICT HEREWITH,' which said ordinance was approved by Isham P. Byrom, Mayor-Councilman, on the 8th day

of June, 1937, a true copy of said ordinance being hereto attached and marked Exhibit 'D' and reference to same is hereby made as often as may be necessary.

"(4) That sub-section (b) of Section 11 of said Ordinance No. 873-A, above referred to, contains the following provisions:

"'Permits shall be issued by the Building Inspector to no one except a duly licensed general contractor under the provisions of this ordinance or to the *bona fide* owner of the premises on which the work or construction is to be done, or to the duly authorized agent of the owner of said premises or to the lessee with the consent of the owner, and where the permit is to be issued to the owner, lessee or his duly authorized agent, the said owner, lessee or agent shall first make and file an affidavit with the Building Inspector that said work or construction for which the permit is sought is not to be done on contract, cost plus, fixed fee, stated sum, percentage, or any combination thereof, other than wages.'

"(5) That the said J. W. Wahlman declined and refused to accept said application and said plans and specifications, and the fee tendered therewith, and refused to issue said permit for the construction of said building because petitioners declined to make and file an affidavit with said building inspector that said work or construction for which the permit is sought is not to be done on contract, cost plus, fixed fee, stated sum, percentage or combination thereof other than wages. That petitioners in their application for said permit, stated that said work was to be done by Harry W. Rise as contractor under a written contract, copy of which was attached to said application, and the said building inspector refused to issue said permit on the ground that the said Harry W. Rise was not a duly licensed general contractor under the provisions of said City Ordinance No.

873-A, and that the relators could not legally contract with him for the erection of said building.

"(6) That said Ordinance No. 873-A enacted by the governing body of the City of St. Petersburg as aforesaid was enacted pursuant to Sub-section (zz) of Section 3, of the Charter of the City of St. Petersburg, Florida, which purports to empower said City of St. Petersburg to define the business of General Contractors, said Charter provision being as follows:

"'(zz) To by ordinance define the business of General Contractor and to by ordinance prescribe the qualifications of general contractors operating in the City of St. Petersburg; to by ordinance create an appropriate Board of Examiners for purpose of examining those desiring to qualify as General Contractors for operation within the City of St. Petersburg and to prescribe by ordinance the compensation of such Board and fees to be paid for examination thereby.'"

It is then alleged that Sub-section (zz) of Section 3 of the Charter Act of St. Petersburg and Ordinance No. 873-A enacted pursuant thereto are unconstitutional and void because they deny freedom of contract guaranteed by the Constitution of the State of Florida and by the Constitution of the United States.

It is also alleged that City Ordinance No. 873-A of the City of St. Petersburg and Sub-section (b) of Section 11 thereof are unconstitutional and invalid because each denies to the relator freedom of contract as guaranteed by the Constitution of the State of Florida and by the Constitution of the United States and constitutes the taking of the property of petitioners without due process of law or just compensation, and for the further reason "that the provisions of said ordinance are arbitrary, unreasonable,

capricious, discriminatory and deny to the parties thereby affected equal protection of the law."

. It is then alleged that there is no valid law of the State of Florida or Ordinance of the City of St. Petersburg enacted pursuant to a valid power granted by the Legislature of the State of Florida which requires relators to do anything further or other than that which has been done as a condition precedent to the issuance of a building permit in the manner and form requested.

It is then alleged:

"(10) That said Ordinance No. 873-A enacted by the City of St. Petersburg as aforesaid, is unconstitutional because the State itself has no right to require the examination and licensing by a Board of persons engaged in a mere trade, to-wit: the trade or business of general contracting. That the business of general contractor and of general contracting is not even nominally concerned with the public health, and the aforesaid ordinance is a mere scheme devised for the aggrandizement of certain classes and has no relation to the public health such as will sustain it as a police or sanitary measure, and that its interferences with the liberty of the citizen and his right to contract brings it in direct conflict with the Constitution of the United States and the Constitution of the State of Florida.

"(11) That, notwithstanding the premises, the said J. W. Wahlman, as Building Inspector as aforesaid, has persistently refused and still refuses to issue to the relators a building permit for the construction of said buildings as shown in Exhibit 'C,' and that by reason of his refusal, relators have been greatly damaged and injured, and that they have no adequate remedy at law which will compensate them for the damage, injury and loss they have suffered and will continue to suffer unless the relief hereinafter prayed for be granted."

So, first, we are asked to determine whether or not Subsection (zz) of Section 3 of Chapter 15505, Special Acts of 1931, being the Charter Act of the City of St. Petersburg, is a valid legislative enactment.

In the case of Miami Laundry Company, a Florida corporation, *et al.,* v. Florida Dry Cleaning & Laundry Board, an official Board of the State of Florida, *et al.,* filed this Term of Court, Mr. Justice TERRELL, speaking for the Court, said:

"Liberty of contract and the right to use one's property as he wills are fundamental constitutional guaranties, but the degree of such guaranties must be determined in the light of social and economic conditions that prevail at the time the guaranty is proposed to be exercised rather than at the time the Constitution was approved securing it; otherwise the power of the Legislature becomes static and helpless to regulate and extend them to new conditions that constantly arise.

"Constitutional guarantees have never been thought to be immune from regulation or limitation in the interest of the common good. When limited, the process has been evolutionary rather than spontaneous. Regulation might be appropriately denied today that could be just as appropriately granted tomorrow. When the exercise of a constitutional guaranty is limited to such a small sector of the population that the rights of the public will be protected by unrestricted competition, the Legislature will not generally attempt to regulate, but when large numbers become involved, many of whom are unequal in the race, and their economic security becomes imperiled through the exercise of what may appear to be the constitutional right of another, then the Legislature has not hesitated to step in and regulate.

"The factors determining the regulation of a trade, business, or profession are for legislative determination, but they have generally been actuated by public necessity. If done in the exercise of the police power, the health, morals, and welfare must be involved. It has also been said that the business regulated must be affected by or clothed with a public interest, but regardless of the basis on which done, if public necessity requires it would be contrary to every concept of social justice to hold that the Legislature could not grant relief. One may 'Robinson Crusoe like' isolate himself and thereby enjoy the complete unrestrained exercise of his constitutional guaranties, but the moment he becomes a unit in organized society, he surrenders a measure of his freedom and the more thickly that society becomes populated and the more complex its means of making a living become, the more freedom he must make up his mind to surrender.

"There is no magic in the phrase, 'clothed with or affected with a public interest.' Any business is affected by a public interest when it reaches such proportions that the interest of the public demands that it be reasonably regulated to conserve the rights of the public and when this point is reached, the liberty of contract must necessarily be restricted. If the regulation involves the question of price limitation, it will be upheld unless clearly shown to be arbitrary, discriminating, or beyond the power of the Legislature to enforce. Nebbia v. New York, 291 U. S. 502, 54 Sup. Ct. 505, 78 L. Ed. 940; Bordens Farm Products Co., Inc., v. Ten Eyck, 297 U. S. 251, 56 Sup. Ct. 453, 80 L. Ed. 669; West Coast Hotel Co. v. Parrish, 300 U. S. 379, 57 Sup. Ct. 578, 81 L. Ed. 703; Highlands Farms Dairy v. Agnew, 300 U. S. 608, 57 Sup. Ct. 549, 81 L. Ed. 835; Miami Home Milk Producers Association v. Milk Control Board, 124 Fla. 797, 169 So. 541. See also in-

ferences from Economy Cash and Carry Cleaners, Inc., v. Cleaning, Dyeing and Pressing Board, *supra;* Coleman, Sheriff, v. Lichtenstein, *supra;* and Bon Ton Cleaners and Dyers v. Cleaning, Dyeing and Pressing Board, *supra."*

This is the latest enunciation of this Court on the subject of the power of the Legislature to regulate trades or businesses.

It must be conceded that the trade or business carried on by the general contractors in the construction of buildings of all sorts is one of paramount importance in the State of Florida. There is probably no State in the Union where the expenditures for the construction of buildings has been greater per capita within the past decade than in the State of Florida. Cities and towns have grown by leaps and bounds. In thirty-one of the principal cities of Florida in 1936 the building permits showed an outlay of $50,-975,600.00 and in 1937 in the same cities building permits showed construction amounting to $51,357,581.00. In 1936 building permits in St. Petersburg amounted to $2,500,-960.00 and in 1937 they amounted to $3,075,675.00.

These are the latest reports available to us showing the progress of construction in the principal cities of the State.

So, it appears that there can be no serious question that public welfare is vitally involved in the matter of construction of buildings of all sorts in this State.

It, therefore, follows that the trade or business of the construction contractor is one which may be regulated in the interest of public welfare, by the Legislature. It is elementary that that character of legislation which the State Legislature has the power to enact, regulating a trade or business, it may delegate to the legislative authority of a municipality to enact for the regulation of trades and businesses within the jurisdiction of such municipality.

For the reasons stated, we must hold that the legislative enactment above referred to was within the power of the Legislature, was a valid enactment, and was effective for the purposes indicated by its enactment.

This brings us to the consideration of the validity of the ordinance attacked.

Ordinance No. 800-A is referred to in the alternative writ of mandamus and by apt words is made a part of the bill of complaint, but it is not shown in the transcript of the record. It is conceded, however, that that ordinance is the Building Code of the City of St. Petersburg. The pertinent part of this ordinance was set out in the alternative writ and has been hereinbefore quoted.

Ordinances of this sort are uniformly held to be valid enactments. The plaintiff in error makes no contention that the provisions of that ordinance are invalid, but it is contended that certain provisions of Ordinance No. 873-A are invalid. That ordinance is entitled:

"AN ORDINANCE DEFINING, REGULATING AND GOVERNING GENERAL CONTRACTORS WITHIN THE CITY OF ST. PETERSBURG, FLORIDA; REQUIRING EXAMINATION OF ALL SUCH CONTRACTORS; PRESCRIBING THE TIME WHEN SUCH EXAMINATIONS SHALL BE CONDUCTED; SPECIFYING AND FIXING THE FEE FOR EXAMINATION; SPECIFYING AND FIXING THE AMOUNT OF THE OCCUPATIONAL LICENSE FEES FOR SUCH CONTRACTORS; CREATING A BOARD OF EXAMINERS FOR CONTRACTORS; DEFINING THE DUTIES AND POWERS OF THE BOARD; SPECIFYING AND PROVIDING PENALTIES FOR THE VIOLATION OF THIS ORDINANCE; REPEALING ALL ORDINANCES AND PARTS OF ORDINANCES IN CONFLICT HEREWITH."

Section 1(a) and 1 (b) of that ordinance provide as follows:

"Section 1. (a) Hereafter, every person, firm, co-partnership, corporation, association or other organization or any combination of any thereof, engaged in or who shall engage in the business and/or capacity of General Contractor, shall procure and maintain at all times while so engaged, City licenses therefor, as is provided in this ordinance.

"Section 1. (b) Every person, firm, co-partnership, corporation, association or other organization, or any combination of any thereof, who is engaged in the business of accepting orders or contracts on cost plus, fixed fee, stated sum, percentage or any combination thereof, or other compensation other than wages, doing work on or in any building or structure requiring the use of stone, brick, mortar, cement, wood, structural steel or iron, sheet iron, metallic piping, tin, lead, or any other building material; or to excavate for foundations or any other purpose; or to construct docks, drive piling, construct bridges, construct seawalls and bulkheads of any and all descriptions; or who is engaged in the business of building, remodeling, repairing, whether it be by day labor, contract, cost plus, fixed fee, stated sum, percentage, or any combination thereof, or other compensation other than wages, shall be deemed to be a General Contractor within the meaning of this ordinance."

Then the ordinance sets up a Board of Examiners of General Contractors and provides the powers and duties of such Board.

Section 6 (a) of the ordinance provides, in part, as follows:

"Section 6. (a) Hereafter, every one desiring to be licensed as a General Contractor in the City of St. Petersburg shall make application to the Board of Examiners by filling in the forms which may be obtained from the Building Inspector's Office of said City and designating whether he desires to be examined for a Class 'A,' 'B,' 'C' or 'D' li-

cense and depositing with such application the sum of $5.00 for Class 'A'; $4.00 for Class 'B'; $3.00 for Class 'C,' and $2.00 for Class 'D.'

"The Board of Examiners shall prepare and conduct separate examinations for each of said classes in accordance with the requirements of the Building Code pertaining to the classification of buildings, and the applicant shall be given the examination for the class for which he applies.

"Each applicant shall be examined by oral, written and practical tests, as to his fitness to be granted a General Contractor's certificate; and shall be graded as follows: 1/3 written; 1/3 oral, and 1/3 practical, with passing grade of 75%.

"The oral and written tests shall be made with reference to knowledge of the Building Code; the practical test shall be evidence of work done in class for which application is made, and such evidence may be furnished by photographs with affidavits of such construction, and/or affidavits of competency from persons for which said work was done.

"If the applicant, however, shall fail to make a grade of 75% as above provided, then the Examining Board shall refuse to grant such certificate.

"The Examining Board shall announce the results of such examination within five days from the concluding date of such examination."

Section 8 provides as follows:

"Section 8. The issuance of a license under this ordinance shall be evidence that the person, firm, corporation, co-partnership, association or other organization, or any combination of any thereof, are entitled to all the rights and privileges of a General Contractor in the division for which the license is issued, and while the license remains unrevoked or unexpired."

Section 11 (a) of the ordinance provides as follows:

"Section 11. (a) Before the prosecution of any work or construction where the cost of said work or construction exceeds $50.00, a permit shall be procured from the Building Inspector."

Section 11 (b) has been hereinbefore quoted.

We cannot hold that the provisions of Ordinance No. 873-A are unreasonable, capricious or discriminatory. Conceding it to be true, which is conceded, that the ordinance constituting the building code of the City of St. Petersburg is a valid exercise of the police power of the City and holding that the provisions of Section (zz) of Section 3 of the Charter Act of the City are valid provisions, it follows that the provisions of Ordinance No. 873-A are valid provisions to effectuate the observance of and compliance with the provisions of Ordinance 800-A, the City building code. In the interest of public welfare the municipality may under its legislative grant of police power enact such reasonable ordinances as reasonably may appear needful to insure to the public the services of competent and qualified contractors engaged in the construction of buildings, construction of which is regulated by the building code of the City, or the municipality.

We find nothing in the Ordinance 873-A which is calculated to work any hardship on a competent and qualified contractor. The rights and privileges of a competent and qualified contractor are amply safeguarded by the provisions of the ordinance and upon a like hypothesis as that upon which the enactment of reasonable municipal building codes are held to be valid as an exercise of the police power in the interest of the general welfare of citizens and residents of the municipality, the provisions of Ordinance No. 873-A will be held valid as a means of facilitating the purposes contemplated by the provisions of the building code.

We recognize that there is a vast difference between the position of an owner who undertakes to construct his own building with labor employed by him for that purpose, and that of the owner who undertakes to construct his building under a contract with a builder, as a general contractor, to furnish all labor and material, necessary for the construction of the building. In the first instance the owner relies upon his own knowledge and experience in such matters, while in the latter instance, he must rely upon the knowledge, experience and integrity of the contractor. It is the engaging in the business or trade of the general contractor which is regulated by Ordinance 873-A.

The allegations of the alternative writ show that the owners made application for the permit to construct the building involved with a contractor who was not licensed under the provisions of the ordinance involved to make and enter into such contract in the City of St. Petersburg.

The permit could not have been granted without carrying with it the permit for the construction of the building by one who had not been licensed to engage in the business or trade of a general contractor for the class of building sought to be erected within the City.

It is not made clearly to appear that the relators were entitled to the relief sought. Therefore, the order quashing the alternative writ of mandamus was without error.

Affirmed.

ELLIS, C. J., and WHITFIELD and TERRELL, J. J., concur.

BROWN, J., concurs in the conclusion.